**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| JANE DOE,<br>       Petitioner,<br><br>vs.<br><br>DAVID EASTERWOOD, et al.,<br>       Respondents. | No. 25-CV-196 CJW-KEM<br><br>**ORDER** |

_____

## TABLE OF CONTENTS

I.     BACKGROUND ............................................................................ 2

II.    LEGAL STANDARD .................................................................... 4

III.   ANALYSIS.................................................................................... 5

     A.    Jurisdiction  ................................................................. 6

     B.    Likelihood of Success on the Merits ........................... 7

          1.    Notice of Reasons for Revocation....................10

          2.    Informal Interview............................................12

          3.    Lawfulness of Re-Detention .............................15

     C.    Threat of Irreparable Harm........................................16

     D.    Balance of the Equities and Public Interest ..................17

     E.    Summary and Remedy ...............................................18

IV.   CONCLUSION............................................................................20

1

This matter is before the Court on petitioner's motion for a temporary restraining order and preliminary injunction. (Doc. 11). Respondents David Easterwood, Todd M. Lyons, Kristi Noem, and Pamela Bondi filed a resistance in which respondent Dave Beuter joined. (Docs. 22 & 24).[1] Petitioner filed a reply. (Doc. 33). On December 2, 2025, the Court heard oral argument on the motion.[2] (Doc. 34). For the following reasons, the Court **grants** petitioner's motion. (Doc. 11).

## I.     BACKGROUND

Petitioner is a 52-year-old native of Somalia who entered the United States on a conditional green card in 1994. (Doc. 1, at 4). Petitioner briefly moved to Cananda in 1995, but she returned to the United States in 1996 on her conditional green card and has resided in the United States since then. (*Id.*). Sometime around 1997, petitioner's conditional green card expired and petitioner was placed in removal proceedings. (*Id.*). Petitioner, with the assistance of counsel, tried to obtain lawful status from approximately 1999 through 2005 through various means, including applying for asylum under the Convention Against Torture, applying for a green card, and applying for permanent residence through the Violence Against Women Act. (*Id.*, at 5–6). Petitioner's original counsel appears to have been woefully ineffective and petitioner's applications were either denied, withdrawn, or not further pursued, likely as a result of counsel's serious missteps. (*Id.*). On May 31, 2005, Immigration and Customs Enforcement ("ICE") granted

---

[1] On December 2, 2025, the Court granted petitioner's unresisted request to substitute Nicholas Whitmore for Dave Beuter. (Doc. 34). Thus, Dave Beuter is no longer a party to this matter.

[2] During oral argument, the Court requested the government produce petitioner's travel documents. With the Court's permission, the government produced the requested information for in camera review on December 5, 2025. The Court is in receipt of the document, but does not find it necessary for the Order here and does not find it necessary to produce the document to petitioner, so the Court will not substantively include the document's information in its analysis.

petitioner an order of supervision with work authorization, which allowed petitioner to live and work in the United States pending her removal if petitioner complied with the terms of the order. (*Id.*, at 6). Petitioner alleges she has complied with the terms of the supervision order, though the government asserts she missed several consecutive annual check-ins between 2020 and 2024. (*Id.*; Doc. 32-1, at 5).

In May, 2025, petitioner completed her annual check-in with ICE where she received receipt of her work authorization renewal. (*Id.*). On July 9, 2025, ICE took petitioner into custody for the purpose of securing a travel document and removal. (Doc. 32-1, at 5). Also on July 9, 2025, a deportation officer served petitioner with a notice of revocation letter, which stated that the circumstances of petitioner's case had changed and "there is a significant likelihood of removal in the reasonably foreseeable future in your case." (Doc. 32-13, at 1). Petitioner alleges she does not know the identity of the ICE agents who detained her, that they did not explain why ICE revoked her order of supervision, and that she was not given an initial informal interview to give her an opportunity to respond to the reasons. (Doc. 1, at 7). Petitioner was initially transported to the St. Paul ICE Field Office in Snelling, Minnesota, but has been moved to several different county jails since then. (*Id.*, at 7). Petitioner is currently being detained at the Hardin County Detention Center in Eldora, Iowa. (Doc. 20, at 1).

The government represents that the Embassy of Somalia issued a travel document ("TD") for petitioner, which the St. Paul ICE Field Office received on October 22, 2025. (Doc. 32-1, at 5). The government contends it was finalizing arrangements to carry out petitioner's removal order on November 28, 2025, before the Court granted a stay so the Court could hold a hearing on petitioner's habeas claim. (Doc. 22, at 8). The government asserts the process of arranging removal flights, which appears to be the only remaining piece in petitioner's removal, is complex and requires coordination between

3

ICE, the United States State Department, airline carriers, and the Somali government, but aliens similarly situated are typically removed within 60 days. (Doc. 32-1, at 5).

Petitioner filed her habeas petition on November 5, 2025. (Doc. 1). On November 14, 2025, the Court entered its initial review order in which it directed respondents to file a response to the petitioner within 14 days. (Doc. 7). Before the response deadline expired, petitioner filed her motion for a TRO and preliminary injunction. (Doc. 11). Petitioner also filed an emergency motion for a ruling on the TRO and preliminary injunction because petitioner understood her removal was imminent. (Doc. 13). The Court issued a stay of petitioner's deportation proceedings so it could hold a hearing on her habeas petition. (Doc. 19). The Court also set a hearing on petitioner's TRO and preliminary injunction motion and her emergency motion at the earliest time the Court's calendar allowed. (*Id.*). The Court held a hearing on December 2, 2025, and the Court considers the matter fully briefed.

Petitioner's habeas petition asserts five counts. Count One asserts a violation of Title 8, United States Code, Sections 1231(a)(3) & (a)(6). (Doc. 1, at 14). Counts Two, Four, and Five assert Fifth Amendment procedural due process violations. (*Id.*, at 15, 18). Count Three asserts a violation of the Administrative Procedure Act, Title 5, United States Code, Sections 706(2)(A), (B), & (D). (*Id.*, at 16).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes federal courts to issue a temporary restraining order ("TRO") or a preliminary injunction. Such relief is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Thus, the movant has the burden of establishing its propriety. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). There are four factors (known as the *Dataphase* factors) to consider before courts may grant injunctive relief: (1) the likelihood of success on the merits, (2) the threat of irreparable harm to a movant

4

absent an injunction, (3) the balance of harms an injunction would have on the other parties and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "No factor is determinative, but the movant's probability of success is the most significant." *Wilbur-Ellis Co. v. Jens*, 139 F.4th 608, 611 (8th Cir. 2025) (citing *Wilbur-Ellis Co. v. Erikson*, 103 F.4th 1352, 1356 (8th Cir. 2024)).

Petitioner requests a TRO and a preliminary injunction. A TRO is not appropriate in this instance. TROs are "temporary," lasting for only 14 days—with the possibility of extension into 28 days. Fed. R. Civ. P. 65(b)(2). Given their temporary status, they are not typically appealable. *Id.*; *see also Trump v. J.G.G.*, 604 U.S. 670, 683–85 (2025) (Sotomayor, J., dissenting); *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 754 (2025) (mem.) (Alito, J., dissenting). The requested relief for the unlawful detainment is release from custody. If petitioner is released, nobody is asking for an order requiring her to return to ICE custody in fourteen days. In other words, in no sense is the relief "temporary." Thus, the Court finds that a preliminary injunction is the only practical option to consider in this situation.

### III.   ANALYSIS

In petitioner's TRO and preliminary injunction motion, petitioner argues she is entitled to relief for at least three reasons. First, petitioner argues the government did not have statutory authority to arrest her because there was no evidence that removal is now reasonably foreseeable. (Doc. 11-1, at 13). Second, petitioner argues if ICE could detain her, ICE failed to provide her with notice of the reasons for her revocation as required by the regulations. (*Id.*, at 14). Last, and relatedly, petitioner argues if ICE was allowed to detain her, ICE did not give her an initial interview as required by the regulations. (*Id.*). According to petitioner, these actions violate her procedural due process rights under the Fifth Amendment. (Doc. 1, at 15, 18).

5

Before addressing the merits of petitioner's claim, the Court must first briefly discuss its jurisdiction to hear petitioner's claims.

### A.    *Jurisdiction*

The government concedes federal district courts have jurisdiction to hear habeas petitions but argues federal district courts are limited in their judicial review of immigration matters, including immigration detention.  (Doc. 22, at 9).  Specifically, the government argues Title 8, United States Code, Section 1252(g) deprives the Court of jurisdiction "to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to . . . execute removal orders against any alien under this chapter."  (*Id.*, at 10 (quoting 8 U.S.C. § 1252(g)).  The government also argues even if federal district courts have jurisdiction with respect to removal, "no court shall enjoin the removal of any alien pursuant to a final order . . . unless the alien shows by clear and convincing evidence the entry or execution of such order is prohibited as a matter of law."  (*Id.*, at 11 (quoting 8 U.S.C. § 1252(f)(2)).  The government then concludes "[p]etitioner's requested relief is limited to release from detention, not a restriction on the Government's authority to carry out her removal order," but cautions "the Court should not grant any relief that would restrict the Government's ability to carry out Petitioner's imminent removal and should end the stay of removal contained in its November 24, 2025, Order."  (*Id.*, at 11).

The Court agrees with the government that petitioner's requested relief is limited to release from detention and not a restriction on the government's authority to carry out her removal order.  Petitioner is challenging her continued detention that she claims is unlawful because it does not comply with due process or the applicable regulations. Petitioner is not challenging her removal or the process by which her removability will be determined.  Petitioner is not even challenging the decision to detain her.  Rather, she is challenging the unlawful means by which she was detained.  This is a habeas matter,

not an immigration matter. *See, e.g.*, *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 152 (W.D.N.Y. 2025). In sum, no statutory provision bars the Court from addressing the merits of petitioner's motion.

Having found the Court has jurisdiction to hear petitioner's claims, the Court proceeds next to the merits of petitioner's arguments in support of her request for a preliminary injunction.

### B. *Likelihood of Success on the Merits*

Petitioner argues she is likely to succeed on the merits of her claim that she is unlawfully detained. To determine whether petitioner is likely to succeed on her claims, the Court must first discuss the relevant immigration scheme generally under which petitioner is detained.

"When an alien has been found to be unlawfully present in the United States and a final order of removal has been entered, the Government . . . secures the alien's removal during a subsequent 90-day statutory 'removal period,' during which time the alien normally is held in custody."[3] *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). If an alien is not removed during the 90-day removal period, "most aliens may be released on bond or paroled" until they are removed from the United States. *Id.* at 683. Aliens released under supervision are generally allowed to live in their communities and maintain employment if they otherwise comply with the terms of their supervision. The government, however, retains the authority to revoke supervision, subject to promulgated regulations.

There are two relevant regulations that establish the process for revocation of an alien's supervision. The first is Title 8, Code of Federal Regulations, Section 241.4(*l*),

---

[3] The United States Code and the accompanying federal regulations use the term "alien." To maintain consistency with the statutory and regulatory text, the Court will use the same term in this Order.

which petitioner asserts applies. Section 241.4 is titled "Continued detention of inadmissible, criminal, and other aliens beyond the removal period," and subsection (*l*) involves "revocation of release." Section 241.4(*l*)(1) provides for how an alien's supervision may be revoked when they violated the conditions of supervised release. Section 241.4(*l*)(2), however, is much broader and allows certain ICE officials to exercise their discretion and revoke supervision when, in the opinion of the revoking official:

> (i) The purpose of release have been served;
>
> (ii) The alien violates any condition of release;
>
> (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
>
> (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

Second, Title 8, Code of Federal Regulations, Section 241.13, which the government believes applies, "establishes a special review process for aliens otherwise subject to § 241.4 'where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future.'" *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *5 (S.D. Fla. Sept. 9, 2025) (quoting 8 C.F.R. § 241.13). Section 241.13 restricts revocation more than § 241.4(*l*) because it only permits revocation if (1) the alien violates any of the conditions of release, or (2) if ICE determines, on account of changed circumstances, that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future. 8 C.F.R. § 241.13(i)(1)–(2). Petitioner arguably qualifies for the stronger protections under Section 241.13, but she argues instead that Section 241.4(*l*) applies instead.

Both Sections 241.4(*l*) and 241.13 include specific procedural safeguards to provide a revoked alien with due process protections. Section 241.13(i)(3) provides:

Upon revocation, the alien will be notified of the reasons for revocation of his or her release. [ICE] will conduct an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision.

Similarly, Section 241.4(*l*)(1), which applies when an alien has violated the conditions of release, states:

Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity be respond to the reasons for revocation stated in the notification.

Although the notice and informal interview requirement appears in Section (*I*)(1), courts have "interpreted section 241.4(*l*) as requiring an informal interview upon the revocation of release regardless of the reason for revocation." *Ceesay*, 781 F. Supp. 3d at 163 (collecting cases). This interpretation makes sense under the regulation's construction. "[Section] (*l*)(2) overlaps with (*l*)(1) with respect to the circumstances when a violation results from a condition of the [supervised release] as the basis for revoking release," which "suggests that paragraph (*l*) sets forth a unified set of procedures for the revocation of removal." *K.E.O. v. Woosley*, No. 4:25-cv-74-RGJ, 2025 WL 2553394, at *5 (W.D. Ky. Sept. 4, 2025). Also, Section (*l*)(3), which applies to all noncitizens whose release is revoked provides that "if the alien is not released from custody following the informal interview . . . then the normal review process will commence." 8 C.F.R. § 241.4(*l*)(3). Because subsection three applies to all revoked noncitizens, this implies the informal interview requirement in section (*l*)(1) "applies to all regardless of whether or not release is revoked for a violation." *Ceesay*, 781 F. Supp. 3d at 164.

Thus, under either Section 241.4(*l*) or 241.13 ICE must provide the revoked alien the reasons for revocation and an informal interview upon revocation.

### 1. *Notice of Reasons for Revocation*

Petitioner argues she did not receive notice of the reasons for her revocation in violation of the applicable regulations and her due process rights. The government provided an exhibit of the notice of revocation letter it served petitioner, but at oral argument petitioner emphasized that the letter lacked sufficient information to put petitioner on notice for why she was being detained, and the proof of service contained the wrong name raising serious doubts about whether the government properly served petitioner.

The regulations state that when an alien's supervision is revoked, ICE must notify the alien of the reasons supervision is being revoked. In a written Notice of Revocation of Release ("Notice") addressed to petitioner, the Notice twice states: "ICE has determined that there is a significant likelihood of removal in the reasonable foreseeable future." (Doc. 32-13, at 1). The Notice also states: "This decision has been made based on a review of your file and/or your personal interview on account of the changed circumstances in your case." (*Id.*).

At least one other district court in the Eighth Circuit that has reviewed identical language in an alien's notice of revocation has found the language is insufficient to inform the alien of the reasons for revocation. In *Roble v. Bondi*, the district court concluded the alien's notice letter contained boilerplate language that "merely parrot[ed] the regulatory text governing re-detention." --- F. Supp. 3d ---, 2025WL 2443453, at *3 (D. Minn. Aug. 25, 2025) (citing other cases reaching the same conclusion). The district court found the notice did not contain individualized language unique to the petitioner, did not state what circumstances had changed, did not inform the petitioner whether ICE had received or was seeking travel documents, and did not advise the petitioner whether

10

the government was seeking to find a third country that would accept the petitioner. *Id.*
This "d[id] not satisfy the Government's obligation to provide the 'reasons' why [the petitioner's] Order of Supervision was revoked." *Id.*

The Court agrees this is boilerplate language and not individualized to a specific alien, but disagrees that it does not put the alien on notice of the reasons for the removal. Under Section 241.4(*l*), which again, petitioner argues applies, there are four possible reasons for revocation. Two of the reasons are broad and two are narrower. The Court can understand why boilerplate, non-specific language would not provide adequate notice if ICE revoked supervision because "the purposes of release have been served" or because "the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." 8 C.F.R. § 241.4(*l*)(2). Without more, the recitation of the regulatory language does not tell the alien anything about the conduct or circumstances that make release no longer appropriate and would not give the alien a chance to respond. The same is true if supervision is revoked because "[t]he alien violates any condition of release." *Id.* An alien cannot contest an accusation that they violated a condition of release if they do not know what they are accused of, and an alien should not have to guess, at the risk of further incriminating themselves, by explaining all their conduct in hoping they are addressing the right thing.

Revocation because "it is appropriate to enforce a removal order or to commence removal proceedings" is different. The boilerplate, parroted language tells the alien their supervision is revoked because there is movement in their removal proceedings and that they will soon be removed from the country. There is not much more information a notice could include that would give an alien a more concrete reason for their revocation. Even including more individualized information about the specific travel documents or travel arrangements would not put an alien on greater notice for why their supervision

was revoked. Here, the Court finds the information in the notice was sufficient to provide petitioner with notice for the reason ICE revoked her supervision.

The Court is also unpersuaded by petitioner's argument that she was served incorrectly, as evidenced by the incorrect name on the proof of service. Including the wrong name on the proof of service is undoubtedly sloppy work. But the government also provided an affidavit from the deportation officer who served petitioner who acknowledged that he made a mistake by including the wrong name on the form but affirming he did indeed serve petitioner. (Doc. 32-2). The affidavit was also presented by the government as true. The Court has no reason to doubt the truth of the statements made under penalty of perjury, and petitioner has provided no grounds to question the reliability of this affidavit.

Thus, the Court finds petitioner has failed to establish her likelihood of success on the merits based on her claim that she did not receive notice of the reason for her revocation.

### 2.    *Informal Interview*

Petitioner also argues she was not given an informal interview in violation of her due process rights and the applicable regulations. (Doc. 11-1, at 14). Again, Sections 241.4(*l*) and 241.13 both state that "[t]he alien will be afforded an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. §§ 241.4(*l*)(1) & 241.13(i).

The government does not directly respond to petitioner's claim that she was not given an informal interview as required under the regulations. Instead, the government argues the informal interview is truly informal and includes "[e]ven a single discussion, at the time of arrest, in which ICE explains its reasons for revoking the Order of Supervision and the alien has an opportunity to respond to such reasons." (Doc. 22, at

12

14–15).  The government also argues petitioner had a formal interview later where she discussed her concerns, and nothing raised during that process would have led to a different result if raised during an informal interview.  (*Id.*, at 15).  In other words, it was harmless error to not have an informal interview.

There are several problems with the government's argument.  First, even if the government is correct that the informal interview need not be anything more than a single discussion at the time of arrest, there is nothing to suggest that a brief discussion ever even happened.  The government provided two affidavits from two different ICE officials, neither of which state the informal interview happened.  (Docs. 32-1 & 32-2).  The ICE agent who served petitioner with the notice says he served her, but says nothing about any interview, conversation, or interaction with petitioner after.  (Doc. 32-2).  The other affidavit is from an ICE official who examined petitioner's entire file.  The affidavit does not contain any information about a documented informal interview.  (Doc. 32-1).  Further, the government's brief in response to the habeas petition and motion for TRO does not even assert there was an informal interview and instead relies on its argument that not much is required of the informal interview and skipping the informal interview here would be harmless error.  Thus, the Court finds petitioner has established she did not receive the informal interview as required and respondents have provided no evidence to contradict that showing.

Second, the government's harmless error argument is unpersuasive.  Here, not having an informal interview may have been harmless, but it is impossible to know that for certain.  The information that apparently came out during a formal interview may not have led to a different result if it had been disclosed during an earlier informal interview, but there is no way to know whether identical information would have been disclosed during the informal interview.  Perhaps something would have occurred to petitioner during an informal interview that she forgot during the formal interview.  Or perhaps an

ICE agent present at the informal interview would have been persuaded by something the formal interviewer was not persuaded by. There is simply no way of knowing whether there would have been a different outcome and it is speculative to say it was harmless error for petitioner to not receive an informal interview after she was detained.

This example illustrates a broader point, though. The regulations are in place to provide specific guardrails to protect a detainees' rights. ICE is required to follow those regulations to make sure an individual's rights are not violated and that a detainee receives due process. *See, e.g.*, *Roble*, 2025 WL 2443453, at *5 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). Although here the outcome might not have been any different had ICE complied with the regulation, in another case the failure may make a difference (for example, if ICE actually attempted to detain the wrong individual and an immediate informal interview would reveal the error before the person was wrongfully detained). Frankly, the outcome here could be that ICE officials, now armed with more concrete travel documents and plans for removal, re-detain petitioner immediately after her release and provide her with detailed notice for the reasons for her revocation and explicitly provide her with an opportunity for an informal interview. Such an outcome would not be a detour to reaching the same results. It is the correct route for compliance with the law and to protect individuals' rights.[4] *See Ceesay*, 781 F. Supp. 3d at 144 ("And while the United States Department of Homeland Security . . . might want to enforce this country's immigration laws efficiently, it cannot do that at the expense of fairness and due process."). Agents cannot operate under a scheme in which if they disregard important safeguards with the promise that if they can cure the

_____

[4] The Court is not suggesting this is either what would or should happen, nor is the Court saying it is authorizing these actions or preemptively finding them lawful. The Court is merely using this example to illustrate its point that even if the eventual outcome is the same, the process by which it happens matters.

14

deficiencies later, all will be well. ICE officials are expected to comply with their regulations and the Court will require that they do so.

Thus, the Court finds petitioner has shown she is likely to succeed on her claim that she was not provided an informal interview in violation of her due process rights and the applicable federal regulations.

### 3.    *Lawfulness of Re-Detention*

Petitioner also argues her re-detention was unlawful. Petitioner argues the government can only re-detain an alien who has been on supervised release if the alien is a flight risk, a threat to their community, has violated the terms of supervised release, or their removal is now reasonably foreseeable. (Doc. 11-1, at 13). Petitioner argues there is no evidence that her removal is now reasonably foreseeable or that it was reasonably foreseeable when she was detained. (*Id.*).

The Court finds that at least throughout the course of her detention her removal became reasonably foreseeable. The government submitted an affidavit in which an ICE deportation officer stated ICE had received travel documents and that similarly situated aliens are removed within about 60 days of receiving travel documents. (Doc. 32-1, at 5). Again, the Court has no reason to doubt the truth of the statements made under penalty of perjury, and petitioner has provided no grounds to question the reliability of this affidavit.

It is less than clear whether petitioner's removal was reasonably foreseeable when ICE detained her on July 9, 2025. The deportation officer's affidavit only states that she was taken into custody "for the purpose of securing a [travel document]." (*Id.*). Section 241.4(*l*), however, expressly permits "revok[ing] release and return[ing] to [ICE] custody an alien previously approved for release . . . [when] it is appropriate to enforce a removal order or to commence removal proceedings against an alien." 8 C.F.R. § 241.4(*l*)(2)(iii). "The regulation permits the Government extraordinarily broad discretion to revoke an

[order of supervised release]; and that discretion is expressly not limited to circumstances where a non-citizen violates the conditions of [their order of supervised release]." *Zhen v. Doe*, 3:25-cv-01507-PAB, 2025 WL 2258586, at *10 (N.D. Ohio Aug. 7, 2025) (quoting *Tanha v. Warden, Balt. Det. Facility*, No. 1:25-cv-02121-JRR, 2025 WL 2062181, at *5 (D. Md. July 22, 2025)).  The deportation officer's affidavit states ICE revoked petitioner's supervision on July 9, 2025, "for the purpose of securing a [travel document] for Somalia and for removal."  (Doc. 32-1, at 5).  Securing a travel document is likely both "appropriate to enforce removal" and a part of "commenc[ing] removal proceedings against an alien."  8 C.F.R. § 241.4(*l*)(2)(iii); *see also Zhen*, 2025 WL 2258586, at *11 (finding ICE validly revoked a petitioner's supervision under Section 241.4(*l*)(2)(iii) when ICE had "merely requested a travel document" for petitioner).

Thus, based on the record before it at the preliminary injunction stage, the Court finds petitioner is not likely to succeed on her claim that she was unlawfully re-detained.

### C.  Threat of Irreparable Harm

Petitioner argues her continued detention constitutes irreparable harm.  Petitioner first argues the loss of her liberty while she is in detention is itself irreparable harm.  (Doc. 11-1, at 15).  Petitioner also argues her detention has irreparably harmed her family in several ways, including placing increased burdens on her eldest children to care for the younger children in her absence.  (*Id.*, at 15–17).[5]

Protracted civil detention clearly threatens irreparable harm.  Indeed, the loss of liberty "is a paradigmatic example of potential irreparable harm."  *De La Cruz v. Noem*, No. C25-150-LTS, 2025 WL 3110876, at *5 (N.D. Iowa Oct. 20, 2025) (quoting *Barrajas v. Noem*, No. 4:25-CV-00322, 2025 WL 2717650, at *6 (S.D. Iowa Sept. 23,

---

[5] Petitioner also alleges irreparable harm she is suffering based on the conditions of the Linn County Correctional facility.  Petitioner has since been moved to a different facility, so her arguments about the Linn County facility are moot.

2025)); *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Fifth Amendment Due Process] Clause protects."). There are only narrow, nonpunitive circumstances under which a special justification authorizes such restraint. *Id.* at 690. None of those special justifications exists here. Petitioner's continued detention in which her freedom and movement are restricted clearly constitute irreparable harm.

The loss of petitioner's liberty alone threatens irreparable harm, so the Court need not also address petitioner's argument that her family has been irreparably harmed.

Thus, this factor weighs in favor of a preliminary injunction.

### D.    *Balance of the Equities and Public Interest*

The balance of the equities and considerations of the public interest are typically distinct, yet they merge when the federal government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). How much weight to give these factors is unclear. *Compare Noem v. Vasquez Perdomo*, 606 U.S. ––––, ––––, 2025 WL 2585637, at *1 (Sept. 8, 2025) (mem.) (Kavanaugh, J., concurring) ("Particularly in 'close cases,' the Court also considers the balance of harms and equities to the parties, including the public interest." (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam))), *with NetChoice LLC v. Fitch*, , 145 S. Ct. 2658 (2025) (Kavanaugh, J., concurring) (arguing that even though law was "likely unconstitutional," application to vacate stay should be denied because petitioner failed to "sufficiently demonstrate[ ] that the balance of harms and equities favors it"). Regardless of their proper weight, the result here tips the balance in petitioner's favor.

As already discussed, petitioner's liberty interest is significant. The government, however, provides at least some measure of a counterweight. The government has a considerable interest in controlling the presence of aliens in this country and carrying out

lawful removal orders. *See Dep't of State v. Muñoz*, 602 U.S. 899, 911–12 (2024) ("[T]he through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens."); *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien unlawfully deemed removable undermines the streamlined removal proceedings . . . and permits and prolongs a continuing violation of United States law." (cleaned up)). In addition, recent Supreme Court orders acknowledge the harm a governmental agency incurs when it is enjoined from acting within its apparent scope of authority. *See, e.g.*, *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153 (2025) (mem.); *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) ("[T]he Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."); *Trump v. CASA, Inc.*, 606 U.S. 831, 861, (2025) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (alteration in original) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012).

Although the Court recognizes the government's interest, on balance petitioner's individual's liberty interest is greater here. *See Ceesay*, 781 F. Supp. 3d at 144 ("And while the United States Department of Homeland Security . . . might want to enforce this country's immigration laws efficiently, it cannot do that at the expense of fairness and due process.").

  **E.**  **Summary and Remedy**

As noted above, a preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. After balancing the *Dataphase* factors however, the Court finds a preliminary injunction to be appropriate. Specifically, the Court finds that petitioner has met her burden of showing that she has a strong likelihood

of success on the merits of at least one of her claims and that she is currently suffering irreparable harm while being detained.

As a remedy, petitioner requests: 1) immediate release from ICE custody; 2) an order enjoining ICE from arresting or detaining petitioner without affirmative evidence that her removal will occur within 5 days; 3) an order that ICE is further enjoined from arresting or detaining petitioner without first terminating her order of supervision in full accordance with the procedures outlined in 8 C.F.R. § 241.4(*l*); and 4) an order enjoining ICE from removing petitioner until her motion to reopen has been fully decided before the Board of Immigration Appeals and Circuit Court of Appeals. (Doc. 11-1, at 18–19).

In cases like petitioner's here, "[a]s a remedy, courts across the country have ordered the release of individuals stemming from ICE's illegal detention." *K.E.O*, 2025 WL 2553394, at *7; *accord Roble v. Bondi*, No. 25-cv-3196 (LMP/LIB), 2025 WL 2443453, at *5 (D. Minn. Aug. 5, 2025); *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 152–53 (D. Mass. 2025); *Zhu v. Genalo*, -- F. Supp. 3d --, 2025 WL 2452352, at *10 (S.D.N.Y. Aug. 26, 2025); *Grigorian*, 2025 WL 2604573, at *10; *Ceesay*, 781 F. Supp. 3d at 170 (W.D.N.Y. 2025). The Court agrees with other district court's that release is the proper remedy and thus, orders petitioner to be released from ICE custody. No bond will be required. *See Richard/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2017) (stating whether to require a bond is within the district court's discretion).

The Court, however, denies petitioner's additional requested relief. First, petitioner has not pointed to, and the Court is not aware of, any statute or regulation that ICE can only revoke a petitioner's supervision if there is evidence that the removal will occur within 5 days. *See* 8 C.F.R. §§ 241.4(*l*) & 241.14. Thus, the Court denies petitioner's request for an order stating she can only be detained if she will be removed within 5 days. Next, petitioner's request for an order enjoining ICE from detaining

petitioner without fully complying with Code Section 241.4(*l*) is unnecessary. This entire Order centers around why ICE must comply with its regulations. A separate order instructing ICE to comply with the law is unnecessary and the Court declines to grant that relief. Last, the Court finds petitioner's request to enjoin ICE from removing her until her Board of Immigration Appeals and Circuit Court of Appeals have concluded is exactly the type of relief federal district courts are prohibited from granting. *See* 8 U.S.C. § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."). Thus, the Court denies petitioner's request for an order enjoining her removal.

The last remaining issue involves the stay the Court entered on November 24, 2025, staying petitioner's removal proceedings until the Court had an opportunity to hold a hearing and rule on petitioner's motion for a TRO. (Doc. 19). The Court held the hearing and hereby issues an order. The relief declared here is also substantially similar to the relief requested in the habeas petitioner, so there is no justification for maintaining the stay longer to allow for adjudication of the underlying habeas petition. Thus, the Court finds the stay is no longer necessary and hereby lifts it.

## IV. CONCLUSION

For these reasons it is hereby ordered:

1. The Court **grants** petitioner's motion for a preliminary injunction.[6] (Doc. 11). The Court **denies as moot** petitioner's request for an expedited ruling on the motion for a TRO and preliminary injunction. (Doc. 13). The Court also

---

[6] As the Court discussed in more detail above, a preliminary injunction, not a TRO, is appropriate here.

**denies as moot** petitioner's motion for issuance of an order to show cause. (Doc. 6).

2. The government is **ordered** to release petitioner from custody by no later than Monday, December 8, 2025, at 5:00 P.M., subject to and in accordance with the conditions in her pre-existing order of supervision.

3. The Court's stay entered on November 24, 2025, is hereby **lifted**.

4. By December 12, 2025, the parties shall submit a status report confirming compliance with the Order. The parties must also address whether the relief afforded by this Order resolves the underlying habeas petition because petitioner is no longer in custody.

**IT IS SO ORDERED** this 5th day of December, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa